# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMAL HAMMOUD, | ) |
| Plaintiff, | ) |
| | ) |
| -against- | ) |
| | ) |
| SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**1:20-cv-00106-MKV**

**DECLARATION OF JOSEPH KHOURY-HÉLOU**
**IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

I, Joseph Khoury-Hélou, declare as follows:

1. I have been a licensed attorney in Lebanon since 1982 and am the founder of the SCP Law Firm in Beirut, Lebanon. My legal career and publications have included extensive practice in the areas of Lebanese banking and business law, commercial litigation, and matters involving transnational concerns.

2. I submit this declaration in support of Société Générale de Banque au Liban's ("Defendant" or "SGBL") motion to dismiss plaintiff Jamal Hammoud's ("Plaintiff") amended complaint (the "Amended Complaint").

3. I am a native Arabic and French speaker and read, and understand English, and for ease of the parties and the Court, have prepared this declaration in English.

4. For the purpose of this declaration I have reviewed copies of the original and translated versions of the following documents:

1

    a.    The "Account Opening Application for Juristic Person" dated  November 1, 2011 duly executed by Milestones Capital ME (Offshore) SAL ("Milestones SAL") and SGBL (the "Agreement").

    b.    The checks drawn by SGBL on its account with Banque du Liban to the order of Milestones SAL, dated April 2, 2020, for the amounts of $131,744 and €323,679, respectively (collectively the "Checks").

    c.    Plaintiff's original Complaint, the parties' respective filings in the first motion to dismiss, and the Amended Complaint filed by Plaintiff in this lawsuit.

5.    I am well-acquainted with the questions of Lebanese banking and contract law at issue in this dispute.

6.    I have reviewed the declaration dated April 14, 2020, from attorney Muhannad Ammar, which was attached as Exhibit C to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss. (ECF 20-3).   In this declaration I address several assertions made in Mr. Ammar's Declaration and expand upon points made in my Legal Opinion dated March 9, 2020, which was submitted as Exhibit C to the Defendant's Memorandum of Law in Support of Motion to Dismiss. (ECF 18-3).

**Lebanese Law Regarding the Discretionary Nature of International Transfers**

7.    Under Lebanese law, the international transfer of funds by Lebanese banks is discretionary.  There is no statute or decree obligating a Lebanese bank to execute such transfers at the request of its client.  Instead, the requested transfer requires the mutual consent of all parties involved, i.e., the client, the bank, and the recipient bank. *See* Special Banking Court, 2nd Chamber, Decision No. 77/247 dated 18 October 1994,

published in SADER–BETWEEN LEGISLATION AND JURISPRUDENCE–THE BANKS, p. 561, p. 69 in Arabic language.

8. The above principle is established in article 307 of the Lebanese Code of Commerce and article 302 of the Code of Obligations and Contracts. Indeed, a bank is considered as the sole owner of the deposit and indebted towards the depositor for the amount of the deposit (plus interest – if any) (article 307 of the Lebanese Code of Commerce). The bank (in the absence of express determination of the place of payment of a debt) can validly settle its debt towards the depositor in relation with the deposit at the place where the bank has its principal establishment (article 302 of the Lebanese Code of Obligations and Contracts). The Lebanese legislator by Law No. 193/2020 dated 16/10/2020 has implemented only one mandatory international transfer of funds in favor of Lebanese students residing abroad with a ceiling of USD $ 10.000 (US Dollars Ten Thousand) subject to specific terms and conditions. To the exclusion of the said mandatory international transfer of funds, a cross-borders transfer of funds is an elective service left to the bank's approval.

9. The applicable principle—firmly established in Lebanese legal jurisprudence and codified in Article 178 of the Code of Obligations and Contracts—provides that "any contract, and generally any agreement, has as its soul and armature the consent of the parties." In the context of a bank-client relationship, "a transfer, which requires for its execution the involvement of bankers, is considered as completed regarding the bankers *once the concerned banker approves the* [client's] *transfer instructions …*" (Court of Appeal of Beirut, Judgment No. 22 dated 11 January 1996, LAW REVIEW OF THE BAR OF BEIRUT "Al Adl", 1996, p. 45 (p. 46 in Arabic language) (emphasis added)).

3

10. As described by a respected Lebanese legal scholar, there is no such right as the "right to the transfer" (*droit au virement*); while the transfer instruction is a mandate given by the client to its bank to debit an amount from the client's account and credit it to another bank account, the client cannot compel the execution of such a transfer without the bank's consent. Dr. Fadi Nammour, BANKING LAW (*Droit bancaire*), Beirut, 2nd Ed., 2012, p. 571 (p. 666 in French language)).

11. Lebanese law does not impose any obligation on banks to provide international transfer services to their clients. Accordingly, in my opinion, SGBL cannot be compelled to execute international transfer instructions and can validly refuse to execute said orders irrespective of demands by the account holder Milestones SAL or by Plaintiff.

12. Notwithstanding Mr. Ammar's dismissive commentary, it is worth noting that the above principle was recently acknowledged by the Court of Cassation of Beirut (Lebanon's highest court) in a decision rendered on 17 February 2020 (Decision No. 130/2020 – Credit Libanais SAL/Abdul Rahman (unpublished)). That the decision was made in the context of non-final ruling does not diminish its instructive value, most notably in the Court of Cassation's endorsement of the local bank's argument that a cross-border transfer is an optional, facultative and elective service and its execution is subject to the bank's approval.

**International Transfer Restrictions on Lebanese Banks**

13. Not only is SGBL within its right to refuse to provide cross-border transfer services under Lebanese law, its refusal was the proper course given banking restrictions in effect in Lebanon.

4

14.  In response to the financial crisis that started in 2019, the Central Bank has imposed explicit and de facto capital control restrictions on all banks in Lebanon, including SGBL, which restrictions have included limitations on international transfers. The Lebanese Legislator has duly acknowledged said capital control restrictions in the preparatory works/explanatory statements of Law No. 193/2020 dated 16/10/2020. The said capital control restrictions incited the Lebanese Legislator to promulgate law No. 193/2020 dated 16/10/2020.

15.  Banks that did make international transfers despite these restrictions have been considered by some public and judicial authorities in Lebanon as making illegal transfers, and several inquiries have opened into the question, which means that any bank executing international transfers might be investigated.  For instance, the Special Investigation Commission (Fighting Money Laundering & Terrorism Financing) requested, in early 2020, that all banks provide the details of all international transfers, respectively, made from October 17 to  December 31, 2019.

16.  These constraints have limited SGBL's ability to effect international transfers (even where SGBL's consent would otherwise be given), and under Lebanese law such challenges would extinguish or suspend any contractual obligation that SGBL would have had to Milestones SAL to make such a transfer (although no such obligation exists, as explained above).

17.  Additionally, Article 341 of the Code of Obligations and Contracts provides that the obligation is extinguished when it becomes impossible for the debtor, either naturally or legally, to perform it. Article 341 relates to *force majeure*, which is defined as being an event external to the parties, unpredictable and insurmountable (G. Sioufi, GENERAL

5

THEORY OF OBLIGATIONS AND CONTRACTS, 2nd Ed., Beirut, 1994, p. 497, et seq. in Arabic language). It is my opinion that the acute and unprecedented financial crisis affecting Lebanon in general and the banking sector in particular, and which led to Lebanon's default on its Eurobonds on March 7, 2020, for the very first time in its history, and brought the international banking and financial activities to a nearly complete stop, would likely be deemed by Lebanese courts to constitute a case of *force majeure* with regard any contractual obligation that SGBL would have had to the Milestones SAL to make an international transfer (although the bank does not have such an obligation).

**Analysis of the Agreement and Lebanese Jurisdictional Principles**

18. There is no dispute that parties to the Agreement are clearly and legally identified as Milestones SAL, a Lebanese entity, and SGBL, a Lebanese bank. I would also note that the Agreement was signed, opened, maintained, and to my knowledge performed exclusively in Lebanon. The Agreement also references the Lebanon Central Bank and Lebanese statues, including Article 428 of the Commerce Law, and Lebanon Bank Resolution No. 5913 dated June 23, 1995.

19. While the Agreement does not include a forum selection clause or a choice-of-law provision, Lebanese statues and jurisprudence provide guidance regarding jurisdictional principles that apply by default. Specifically, Article 302, para. 1 and para. 2, of the Lebanese Code of Obligations and Contracts provide that "(1) The debt should be paid at the place determined in the contract. (2) Absent an express or implicit determination to that effect, the payment is to be collected at the debtor's domicile." Since SGBL is debtor of the amount of Milestone SAL's deposit, and since the Agreement does not determine a place where this debt (deposit) should be paid by SGBL to Milestones SAL,

then the above-cited provisions of Article 302 apply, and the location for Milestone SAL's collection of its deposit should be at SGBL's office.

**Lebanese Law Regarding Disbursement of Deposits by Check**

20. Because SGBL has no statutory or contractual obligation to Milestones SAL to carry out international transfers, SGBL could decline to transfer the funds and, instead, propose to satisfy its restitution obligations to Milestones SAL in another manner. This could include transferring Milestones SAL's deposit to another bank located in Lebanon or remitting to Milestones SAL a check drawn on Central Bank (which can only be credited to a Lebanese bank account). Nothing in Article 307 of the Lebanese Code of Commerce, which, by reference made by Article 123 of the Lebanese Code of Money and Credit governs bank deposits, obligates banks to disburse funds to their clients in any specific manner or agree to any specific request. Legal scholars (F. Nammour, *Droit bancaire*, Beirut, 1st Ed., 2003, p. 1144) and some courts (Court of Appeals of Beirut, Decision dated March 6, 1986, LAW REVIEW OF THE BAR OF BEIRUT "Al Adl", 1988, p. 169, p. 171 in Arabic language) affirm that the restitution of bank deposit to the client can be effected by way of transfer (in this case, to another bank located in Lebanon), or in cash, or by check: these three means of payment are considered to be equivalent.

21. SGBL may pay Milestone SAL's deposits by arranging for the issuance and remittance of banker checks, such as the Checks, to their order. Payments such as the Checks are recognized under the Lebanese law as a valid payment method usable in Lebanon, as provided for in Article 409 of the Code of Commerce.

**Conclusion**

For the reasons given above, it is my opinion that:

7

a. Under established Lebanese law, SGBL is not obligated to execute any international transfer request for Milestones SAL or Plaintiff and has the legal right to refuse to execute said transfer request.

b. SGBL's issuance of the Checks to Milestones SAL is consistent with Lebanese law and fully satisfied its obligations to return deposited funds to its client.

c. The Checks are valid payment instruments under Lebanese law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  June 18, 2021
Beirut, Lebanon                                        Joseph Khoury-Hélou

8